## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **PNC BANK, NATIONAL ASSOCIATION,** | : | Civ. No. 11-1302 (KM) (MAH) |
| | : | |
| **Plaintiff,** | : | **OPINION** |
| | : | |
| **v.** | : | |
| | : | |
| **DAVID SADEK, ETTY SADEK, FIRST FINANCIAL EQUITIES, INC., WINTHROP ABSTRACT OF NEW JERSEY, LLC, WINTHROP ABSTRACT, LLC, UNITED GENERAL TITLE INSURANCE COMPANY, and FIRST AMERICAN TITLE INSURANCE COMPANY,** | : | |
| | : | |
| **Defendants.** | : | |

Defendants David and Etty Sadek took out a refinancing loan, secured by a mortgage on their Teaneck residence. Mr. Sadek, however, was not merely the borrower. He is in the home financing field; he and his associates wore several hats in the transaction. When Mr. Sadek defaulted on the loan, the lenders' successor in interest, Plaintiff PNC Bank, N.A. ("PNC") found that the property had been sold but that the mortgage lien had not been properly recorded. PNC sued all of the participants in the refinancing transaction: the Sadeks; the loan originator, First Financial Equities, Inc. ("FFE"); the title agent, Winthrop Abstract, LLC ("Winthrop Abstract"), and a related entity, Winthrop Abstract of New Jersey, LLC ("Winthrop-NJ"); the title insurer, United General Title Insurance Company ("UG"); and UG's successor in interest, First American Title Insurance Company ("FATICO"). Now before the court is the

motion of UG and FATICO (collectively, the "Title Insurers") for summary judgment on all counts asserted against them by PNC.[1] (Dkt. No. 156)

Major participants in this refinancing have admitted liability or defaulted as to PNC's claims. A consent judgment was entered in favor of PNC and against David Sadek in the amount of $995,048.21. (Dkt. No. 132) Defendants FFE, Winthrop Abstract, LLC and Winthrop-NJ, LLC failed to answer or defend. As to them, default judgment was entered as to liability. (Dkt. Nos. 133, 134)

What PNC is attempting to do here is to hold the title insurer, UG, liable for its losses as a result of the actions of Sadek and associated persons and entities.[2] For the reasons set forth below, I find that UG's liability raises multiple issues of fact, and deny the motion for summary judgment.

## Background

### Parties

At the time of the events relevant here, Defendants David and Etty Sadek were husband and wife residing at 374 Winthrop Road, Teaneck, New Jersey (the "Property"). (Declaration of Jeffrey L. Rudnick, Esq. In Support of PNC's Answer to Title Insurer Defendants' Motion for Summary Judgment, Dkt. No. 157-5 ("Rudnick Decl."), Ex. P (David Sadek's Answers to PNC's Requests for Admission, Dkt. No. 157-21 ("D. Sadek Admissions"), Response No. 17) David Sadek was the principal shareholder and CEO of Defendant First Financial Equities, Inc. ("FFE"), a mortgage banking entity which funded loans and sold those loans on to investors on the secondary market. FFE drew on monies from a warehouse line of credit through Washington Mutual. (Declaration of Frank J. Haupel In Support of Motion for Summary Judgment, Dkt. No. 3 ("Haupel Decl."), Ex. D) The Sadeks were also involved in title agency entities under the name Winthrop Abstract, LLC ("Winthrop Abstract"). There were two such entities, one based in New Jersey ("Winthrop-NJ") and the other in New York

---

[1]     The defendant Title Insurers have asserted cross-claims against their co-defendants. This motion for summary judgment does not relate to those claims.

[2]     UG has recourse against Sadek, but presumably PNC and UG both believe Sadek cannot satisfy the judgment.

2

("Winthrop-NY"). David Sadek held a 60% interest in Winthrop-NY. Etty Sadek held 49% of Winthrop-NJ. Jonathan Boxman, the owner of Integrity Title Agency, Inc. ("Integrity"), held 40% of each of the Winthrop Abstract entities. Both operated out of an office at 654 Sharrotts Rd., Staten Island, New York, although Winthrop-NJ also maintained an office at 25 Rockwood Place, Englewood, New Jersey.

David Sadek's mother, Rachel Sadek, worked at Winthrop-NJ in its Englewood office. (D. Sadek Admissions, Response Nos. 12, 13) David Sadek's sister, Miriam Greenberg, conducted closings as an independent contractor, sometimes on behalf of Winthrop-NJ. (*Id.* at Response Nos. 14, 15)

Another entity is relevant. The Closing Network was "formed" by Jay Zucker and Steven Kwestel of the law firm Zucker & Kwestel, LLP, and David Sadek. According to Kwestel the actual partners were their three spouses, including Etty Sadek. The Closing Network may or may not have acted as a closing or settlement agent here.[3]

The Refinancing

In 2005, Etty Sadek was the record owner of the Property. (Title Insurer Defs. Facts ¶ 19; Haupel Decl., Ex. P) As of October 2005, there were two recorded mortgages on the Property: (1) one mortgage dated December 23, 1989, held by Summit Bank in the amount of $461,435.00, and (2) a second mortgage dated March 30, 2002, held by Chevy Chase Bank in the amount of $348,000.00. (Haupel Decl., Exs. Q, R; D. Sadek Admissions, Response No. 20) David Sadek sought to refinance those mortgages at a fixed rate with a $792,000.00 secured loan from FFE. (D. Sadek Admissions, Response Nos. 18,

---

[3]     The Closing Network was formed around 1998 to act as a settlement agent. (Haupel Decl., Ex. I, 19:11-14) At its inception, the principals were Etty Sadek, Linda Katz and Hadassah Sohn, the spouses of David Sadek, Jay Zucker, and Steven Kwestel, respectively. (*Id.* at 26:10-27:7) Kwestel denied that he, Zucker or David Sadek had an interest in The Closing Network (*id.* at 20:11-21), but also testified that after meeting David Sadek in 1998, the three developed a relationship and "at some point after that we formed the Closing Network." (*Id.* at 35:6-11) Kwestel denied that the law firm of Zucker & Kwestel provided legal services for The Closing Network, but said they acted as an escrow agent for The Closing Network and would receive and distribute funds on its behalf. (*Id.* at 32:13-33:1)

19) The proceeds of that loan were to be used to pay off the two outstanding mortgages. (*Id.* at Response No. 21) In connection with the transaction, David and Etty Sadek were to become joint owners of the property.

The Closing

The loan closed on October 31, 2005. In connection with the closing, a number of documents were executed, including a promissory note signed by David Sadek and a mortgage executed by David and Etty Sadek in favor of Mortgage Electronic Registration System, Inc. ("MERS"), a nominee for FFE. (Haupel Decl., Exs. V, W) Another document executed at the closing was a U.S. Department of Housing and Urban Development settlement statement ("HUD-1"). (*Id.*, Ex. GG) The HUD-1 provides a breakdown of settlement costs. The HUD-1 for the Property listed, among other things, $375 for a settlement or closing fee, $2157 for title insurance, $25 for notice of settlement and $375 for recording charges. (*Id.*) All of these amounts were noted as "POC," or paid outside of closing, to Winthrop Abstract. (*Id.*)

David Sadek's sister Miriam Greenberg conducted the closing, although the parties seem to dispute whether Ms. Greenberg did so on behalf of Winthrop-NJ or The Closing Network. There were two HUD-1 statements in the loan file for this Property. (UG Exs. FF, GG) One of the statements listed The Closing Network (Ex. FF), while the second listed Winthrop-NJ (Haupel Decl., Ex. GG).

Post-Closing/Settlement

Following the execution of the documents on October 31, 2005, the proceeds of the loan were to be sent to the settlement agent for distribution to the outstanding mortgage holders, and the mortgage was to be recorded. The parties again disagree as to who was responsible.

At the closing, Miriam Greenberg took possession of the mortgage and gave it to Rachel Sadek, who transmitted it to the Winthrop-NJ Staten Island office. Ms. Greenberg acknowledged that she did the closing on the Property as closing agent for Winthrop Abstract. (Haupel Decl., Ex. J, 19:18-21, 20:14-18). Ms. Greenberg denied, however, that she was responsible as settlement agent;

her responsibility ended, she said, when she transmitted the documents to Winthrop Abstract. (*Id.* at 36:3-9) (Ms. Greenberg did wear many hats, working for FFE, Winthrop Abstract and the Closing Network, so the significance of her participation is ambiguous. (Haupel Decl., Ex. K, 6:10-13, 11:13-16, 27:21-23)). Responsibility for recording the mortgage, said Greenberg, rested with Winthrop Abstract. That was "the procedure." (Haupel Decl., Ex. J, 21:22-22:9)

For her part, Rachel Sadek testified that her role at Winthrop-NJ was to obtain the closing package of documents from FFE, make copies and distribute those copies to the closer, and then, after the closing, receive the package back to be overnighted to the title agent, David Cappucelli. (Haupel Decl., Ex. L, 12:2-19) It was her understanding that Cappucelli would record the mortgage for Winthrop-NJ. (*Id.* at 30:20-22) Rachel Sadek would not review the documents; she just shipped them out. (*Id.* at 15:24-16:19; 31:18-23) Rachel Sadek kept no records of the loans or copies of the closing package. (*See id.* at 19:1-7)

Greenberg disclaimed any role in disbursement of the loan proceeds. That function, too, was to be performed by the settlement agent, Winthrop-NJ. (*Id.* at 37:24-38:10) On November 2, 2005, however, Washington Mutual, the warehouse lender for FFE, wired the loan proceeds in the amount $787,255.85. (Haupel Decl., Ex. CC) The money was wired not to Winthrop-NJ, but rather to The Closing Network's attorneys (who—of course—were also part owners, along with Etty Sadek). On November 8, 2005, The Closing Network issued two checks, one to Chevy Chase Bank in the amount of $344,492.76, and one to Bank of America in the amount of $442,763.09. (*Id.*, Exs. CC, DD, EE) The memo lines for both checks read "Sadek w/ FFEI." (*Id.*) Those checks went to pay off the underlying mortgages on the Property. According to the attorney, this was not done on behalf of the Closing Network *per se*, but merely as a favor to Sadek. (Haupel Decl., Ex. I, 42:13-43:3)

On November 2, 2005, Winthrop-NJ issued an invoice for $2,557. (Haupel Decl., Ex. Y) The invoice reflects $1,734 for "premium rate refinance"

and $375 for "settlement fee out of office," among other charges. (*Id.*) There is no evidence of the person or entity to which this invoice was sent, nor is there any record that it was paid.

<u>Resale of the Property Without Disclosure of Unrecorded Mortgage</u>

On November 30, 2005, FFE sold the loan to National City Mortgage. (PNC Facts ¶167) The mortgage had not been recorded.

On March 2, 2006, just four months after the refinancing, the Sadeks sold the Property to Daniel and Tsipora Gurell for $995,000.00. (D. Sadek's Admissions, Response No. 36) The Gurells financed the purchase in part with a $400,000 mortgage from JP Morgan Chase Bank, N.A. (Haupel Decl., Ex. MM) The Sadeks did not inform the Gurells about the loan and mortgage, now held by National City. And they did not tell National City about the sale. (D. Sadek's Admissions, Response Nos. 39, 41) The Sadeks did not use the proceeds of the sale of the Property to pay off the mortgage loan. (*Id.* at Response Nos. 46, 47)

In February of 2006, National City sold the loan to Bank of America (although National City continued to service the loan), and on July 3, 2009, MERS assigned the mortgage to Bank of America. (Haupel Decl., Exs. TT, UU) Later that year, National City merged with PNC. PNC repurchased the loan in March of 2010 and Bank of America assigned the mortgage to PNC on January 20, 2011. (Rudnick Decl., Ex. V)

**The Agency Agreement, Closing Service Letter, and Title Insurance Commitment**

PNC alleges that its losses flow from the failure to record the mortgage. Sadek, as owner of the property, is primarily liable for failing to disclose the mortgage, and PNC already has a judgment against him for the $995,000 sale price of the house.[4] But Sadek wore other hats. PNC asserts that his company, Winthrop-NJ, was responsible for recording the mortgage, and that Winthrop-NJ was UG's agent.

---

[4]     The Sadeks, of course, had actual knowledge of the mortgage lien; as to them, recordation is not an issue. Hence the consent judgment for $995,000.

The relationship between Winthrop-NJ and UG is governed by an Agency Agreement. PNC asserts claims against UG based on (1) the Closing Service Letter, which allegedly made UG contractually liable for the failure of Winthrop-NJ to record the mortgage; and (2) the Commitment to issue a policy of title insurance. I describe those documents briefly.

<u>Winthrop's Agency Agreement with UG</u>

Winthrop-NY and Winthrop-NJ were both approved title agents of the title insurer, UG. Jonathan Boxman, on behalf of Winthrop Abstract, signed a Title Insurance Agency Agreement with UG on February 18, 2004 ("Agency Agreement"). (Haupel Decl., Ex. O) Pursuant to the Agency Agreement, Winthrop Abstract was authorized to issue "Title Insurance Products" in the State of New Jersey on behalf of UG. (*Id.* § 2.1)

The Agency Agreement defined Title Insurance Products to include policies of title insurance, as well as similar instruments:

> all policies of title insurance, commitments for title insurance, binders, guarantees, title reports, endorsements and other authorized title insurance contracts under which the Company expressly assumes specific indemnity obligations concerning the state or condition of ownership or title to land.

(*Id.* § 1.1)

Winthrop Abstract could issue title insurance products up to an underwriting limit of $500,000.00. For products above that dollar amount, prior written approval by UG was required. (*Id.* §§ 1.5, 4.4)

The Agreement also had an "insider" provision. Winthrop Abstract needed to obtain prior written approval to issue Title Insurance Products on property in which

> the Agent or any of the Agent's officers, directors, employees, partners, stockholders, attorneys, or agent have an interest, either ownership or financial or some other type of vested right, and also have a direct input, control or influence over title decisions concerning the Title Insurance Products to be issued on such property.

(*Id.* § 4.10)

<u>Closing Service Letter</u>

Winthrop Abstract, as agent for UG, was authorized to issue Insured Closing Service Letters. Typically, a title company will issue a Closing Service Letter to protect the lender against certain losses arising from acts of the title company's agent in connection with the closing. These ordinarily include misappropriation of funds or failure to record the mortgage in accordance with the lender's instructions.

The Agency Agreement defined an Insured Closing Service Letter thus:

> Letter or agreement issued at the discretion of [UG] wherein [UG] assumes certain expressly defined responsibilities for proper performance of closing or settlement services by Agent. The obligations assumed are separate and apart from liabilities or obligations assumed by [UG] under Title Insurance Products and may be terminated and cancelled by [UG] at any time without notice to Agent.

(*Id.* § 1.10)

This Agency Agreement has a built-in conflict of interest. That is, the Closing Service Letter is not issued by UG directly, but by its agent, Winthrop Abstract. UG's guarantee of the agent's conduct is thus issued by that very agent, on UG's behalf. UG sought to protect itself by closing the circle of indemnification. The Agency Agreement provided that Winthrop Abstract would indemnify UG for losses arising from any Closing Services Letter issued by Winthrop or its agents. (*Id.* § 5.6)

On November 2, 2005, Winthrop-NJ, on behalf of UG, issued such a Closing Services Letter (the "CSL") to the lender, FFE, in connection with the Sadek refinancing. (PNC Exs. M, N) That CSL obligated UG to reimburse FFE for loss arising from (1) the Issuing Agent's failure to comply with FFE's written instructions, or (2) the Issuing Agent's fraud or misapplication with respect to the loan proceeds. (*Id.*) Although Winthrop-NJ's loan file has apparently been destroyed, those "instructions," says PNC, included recordation of the mortgage. More about that later.

8

Title Insurance Commitment

In connection with the loan, FFE was supposed to obtain a UG title insurance policy through UG's agent, Winthrop-NJ. The purpose of that policy was to protect the lender against title flaws, in particular by ensuring that, post-closing, it would enjoy a properly recorded first mortgage lien on the Property. Winthrop-NJ issued a commitment for title insurance on behalf of UG dated October 10, 2005 (the "Commitment"). (Haupel Decl., Ex. AA) The Commitment provides that UG "commits to issue its policy or policies of title insurance...in favor of the proposed Insured...upon payment of the premiums and charges therefor." (*Id.*) The named Insured was FFE, its successors and assigns.

Schedule B to the Commitment set forth the conditions under which the Commitment would ripen into an actual policy of title insurance. These included:

> 2. Document(s) satisfactory to us creating the interest in the land and/or the mortgage to be insured must be signed, delivered and recorded and properly indexed in the land records:
>
>> a. Mortgage by David Sadek and Etty Sadek to the insured mortgagee. If married, spouse must join in mortgage.
>>
>> b. Deed from Etty Sadek to David Sadek and Etty Sadek
>
> 3. Pay us the premiums, fees and charges for the policy.

(*Id.* Schedule B)

The Commitment expired after 180 days, or when the title insurance policy actually issued, whichever came first. (*Id.*)

**Procedural History**

Pre-suit Claims Against UG

On February 14, 2008, JP Morgan (as holder of the Gurells' mortgage), notified UG of a potential title insurance claim. JP Morgan, in connection with a foreclosure on the Property, had conducted a title search and discovered the Sadeks' unrecorded $792,000 mortgage. (Haupel Decl., Ex. JJ) G. Randolph Comstock, on behalf of UG, investigated the claim. Mr. Comstock determined

that no premium had been paid for a policy of title insurance and that no such policy was issued by UG. Comstock determined that documents in the loan file established that The Closing Network, not Winthrop-NJ, had acted as settlement agent. (*See id.*, Exs. FF, HH, II, PP, QQ, RR) UG therefore denied the claim by letter dated March 18, 2008. (*Id.*, Ex. MM) JP Morgan did not dispute the denial.

On March 31, 2010, Bank of America, as assignee of the mortgage, requested that UG reconsider its denial of JP Morgan's claim. UG confirmed its denial of coverage on May 3, 2010. Bank of America did not dispute the denial.

After acquiring the mortgage from Bank of America, by letter dated March 1, 2011, PNC sought reconsideration of UG's denial of coverage. (Haupel Decl., Ex. OO) Without waiting for a response, PNC filed this action.

This Action

PNC filed the complaint in this action on March 8, 2011. (Dkt. No. 1) On August 28, 2012, PNC filed an amended complaint. (Dkt. No. 87) Less than a month later, on September 13, 2012, PNC filed a Second Amended Complaint. (Dkt. No. 93) David Sadek answered the Second Amended Complaint on October 5, 2012, and cross-claimed against all defendants. (Dkt. No. 106) On October 9, 2012, the Title Insurers answered the Second Amended Complaint, cross-claimed against all defendants, and counterclaimed against PNC. (Dkt. No. 108) On November 10, 2012, Etty Sadek answered the Second Amended Complaint and David Sadek's cross-claim, and she also asserted cross-claims against David Sadek. (Dkt. No. 110) On November 12, 2012, PNC answered the Title Insurers' counterclaim. (Dkt. No. 116)

On February 14, 2013, a consent judgment was entered in favor of PNC and against David Sadek on count 1 of the Second Amended Complaint in the amount of $995,048.21. (Dkt. No. 132) Defendants FFE, Winthrop Abstract, LLC and Winthrop-NJ, LLC failed to answer or defend. On March 6, 2013, default judgment was entered against those defendants on the issue of liability. (Dkt. Nos. 133, 134)

On September 3, 2014, the Title Insurers filed this motion for summary judgment on the claims asserted against them by PNC. (Dkt. No. 156) PNC opposed it, and the Title Insurer Defendants filed a reply. (Dkt. Nos. 157, 158)

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

## Discussion

### A. Legal Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of

material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## B. Actual and Apparent Authority

PNC alleges that in failing to record the mortgage, Winthrop-NJ failed to follow written closing instructions, committed fraud, and misappropriated the loan proceeds, thereby breaching the Commitment and CSL. PNC claims that UG is liable because Winthrop-NJ issued the Commitment and CSL as agent for UG. The Commitment and CSL were designed to indemnify FFE (and its successors and assigns, such as PNC) for losses caused by Winthrop-NJ's failure to record the mortgage. The Title Insurers assert that they cannot be liable to PNC for breach of the Commitment or CSL because Winthrop-NJ lacked authority to issue them.

An agent may bind a principal only for acts that "are within [the agent's] actual or apparent authority." *New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guar. Co.*, 1 A.3d 632, 639 (N.J. 2010) (citing *Carlson v. Hannah*, 78 A.2d 83, 88 (N.J. 1951)). Actual authority arises "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). Apparent authority arises "when a third party reasonably believes the

actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03. In other words, where a principal "acts in such a way as to convey the impression to a third party that an agent has certain power which he may or may not possess," apparent authority may be found. *Lampley v. Davis Mach. Corp.*, 530 A.2d 1254, 1259 (N.J. App. Div. 1987). The focus is on the principal's acts and statements; the agent's unilateral, unauthorized representations do not create apparent authority. *See Wilzig v. Sisselman*, 506 A.2d 1238, 1244 (N.J. App. Div. 1986) (citing *Mesce v. Auto. Assoc'n. of New Jersey*, 73 A.2d 586, 589 (N.J. App. Div. 1950)).Whether there is apparent authority depends in addition upon the third party's reliance on the agent's seeming authority to act. *See Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 80 (N.J. 1993).

### a. Actual Authority

Actual authority is lacking, say the Title Insurers, for two reasons. First, the loan was for $792,000, far above the $500,000 underwriting limit set forth in the Agency Agreement. Second, the "insider" provision of the Agency Agreement required advance authorization from UG, because Etty Sadek was a member of Winthrop-NJ and also held title to the property in question. (*See* Ex. O, §§ 4.4, 4.10) Therefore, Winthrop-NJ lacked the contractual authority to issue the Commitment or the CSL as UG's agent.

As to the Commitment, PNC does not seem to disagree that Winthrop-NJ lacked actual authority. I therefore set it aside.

As to the CSL, however, PNC contends that Winthrop-NJ did have actual authority. According to PNC, the $500,000 underwriting limit applied only to "Title Insurance Products." Those Products did not, says PNC, include Closing Servicing Letters.

The Agency Agreement limits Winthrop-NJ's authority to "commit, obligate or hold Agent out as having the authority to bind Company to any obligation, contract, liability or duty other than for Title Insurance Products as expressly authorized herein." (Ex. O § 4.11) And the Agency Agreement does

indeed define Title Insurance Products, including commitments for title insurance, separately from Insured Closing Service Letters. (Ex. O; Compare § 1.1 with § 1.10) So whether the dollar limit applies to the CSL is at best an issue of contract interpretation involving contested facts.

The Title Insurers add that an "insider" provision contained in a contemporaneous amendment to the Agency Agreement imposes an independent limit on Winthrop-NJ's authority. Defining Insured Closing Service Letters, the Agreement adds:

> Company shall not, and shall have no obligation to, issue any CLS to, for or for the benefit of any entity or individual which is an owner, officer, director, employee, partner, stockholder or member of Agent, or their agents, representatives or attorneys. Agent shall have no authority or standing to request the issuance of CLS's by Company to such entities or individuals, and Agent shall have no authority to issue CLS's for such entities or individuals through the Company's automatic CLS system.

(Ex. O p. 13) True, the direct beneficiary of a CSL is the lender, FFE. But David Sadek was the principal shareholder and CEO of that entity. The borrower (Sadek again) might also be seen as a beneficiary. That, too, raises issues of fact and interpretation.

On this record, there is material issue of fact as to Winthrop-NJ's actual authority to issue this CSL without specific authorization in advance. Viewed favorably to PNC, the evidence would suggest that actual authority existed. That is enough to dispose of the authority issue for present purposes. I nevertheless briefly discuss apparent authority.

### b. Apparent Authority

As to claims between UG and PNC apparent authority is pertinent.[5] The Title Insurers contend that Winthrop-NJ did not have "apparent authority" to

---

[5]    Lack of actual contractual authority would be most pertinent to a claim between UG and Winthrop-NJ. The jury could conclude that an outsider—a bank taking the loan by assignment, for example—would not be expected to familiarize itself with the details of the agreement between the title insurer and its agent, even assuming it had access.

issue the Commitment or CSL because there is no evidence that UG ever represented to FFE or its successors, National City and PNC, that Winthrop-NJ had authority in connection with the transaction. PNC emphasizes, however, that Winthrop-NJ, by contract, *was* UG's agent. UG both permitted and intended that Winthrop-NJ act on its behalf. And nothing on the face of the Commitment or CSL would alert a third party that this transaction was an exception—*i.e.*, that in this particular case, Winthrop-NJ's authority did not extend to issuing those documents on UG's behalf.

As to apparent authority, I find that there is a genuine material issue of fact. Winthrop-NJ was, and was held out as, UG's agent. The CSL itself states that the lender is protected against certain losses "incurred by you in connection with such closing when conducted by the above named Issuing Agent (an agent authorized to issue title insurance for the company)...." Such a letter conveys to the lender (if the lender bothers to look), that the named agent possesses authority and that the title insurer stands behind the agent. *See RTC Mortg. Trust v. Fid. Nat'l Title Ins. Co.,* 58 F. Supp. 2d 503, 539 (D.N.J. 1999).

The Title Insurers contend that the lenders, especially National City, were on notice and did not act with reasonable prudence. Perhaps; the issue is one of factual interpretation. But a third party does not have "an affirmative duty to inquire of one appearing to be a general agent regarding the scope of his authority. Rather, what is required is that the third party act reasonably in light of the facts of which it has notice." *PXRE Corp. v. Terra Nova Ins. Co. Ltd.,* 76 F. App'x 485, 490 (3d Cir. 2003). There is at least an issue of fact in this regard.

---

Once again, the many-hats problem requires that I inject a note of reality. Mr. Sadek, wearing his Winthrop-NJ hat, did not represent (or misrepresent) his authority to himself, wearing his FFE hat. The record would support an inference, however, that the entire business model here involved FFE's quickly flipping the loans to others. The purchasers would have relied on the apparent regularity of the underlying transaction—such as the statement in the HUD-1 that title insurance had been purchased and paid for "outside of closing." A jury could also find that FFE's failure to "protect" itself by ensuring recordation of the mortgage was, from Sadek's point of view, not a bug but a feature.

The situation suggested apparent authority, and a jury could so find. Lack of apparent authority provides no basis for summary judgment.

## C. Breach

As to the breach of the CSL, there are likewise issues of fact.

To begin with, the Title Insurers make much of the distinction between an issuing agent (who acts for the title insurer) and the settlement agent (who acts for the lender), and say that the latter position was occupied by The Closing Network. That, however, is a statement of the ideal anatomy of a transaction, not the particular pathology of this one. The overlapping, ill-defined responsibilities of the participants (all of whom seem to trace back to David Sadek one way or another) create multiple issues of fact.

The CSL provides coverage for the "failure of Issuing Agent or Attorney to comply with your written closing instructions to the extent that they relate to [title or] the collection and payment of funds due you" or "fraud of or misapplication by the Issuing Agent or Attorney in handling your funds." (Ex. BB) CSLs, which "are integral to title insurance policies," are interpreted in the same manner, *i.e.*, liberally in favor of the insured and strictly against the insurer. *Walsh Secs., Inc. v. Cristo Prop. Mgmt., Ltd.,* 858 F. Supp. 2d 402, 418 (D.N.J. 2012).

The Title Insurers stress that they cannot be liable under the CSL for the issuing agent's failure to follow written closing instructions to record the mortgage.[6] This is because, according to the Title Insurers, no written closing instructions were found in the loan file, and thus there is no evidence that

_____

[6]      The other basis for liability in the CSL is the issuing agent's fraud or misapplication with respect to the lender's funds. The evidence presented demonstrates that The Closing Network (represented by Zucker & Kwestel, LLP) received the closing funds via a wire on November 2, 2005 in the amount of $787,255.85, and six days later wrote two checks totaling that amount and satisfying the two mortgages on the Property: one check was written to Chevy Chase Bank in the amount of $344,492.76 and the other was written to Bank of America in the amount of $442,763.09. (UG Exs. I 32:13-22, CC, DD) The memo line for each of the checks read "Sadek w/ FFE." (Id.) Mr. Kwestel contends that his firm received the loan money in error and distributed that money to Chevy Chase Bank and Bank of America as a favor to Mr. Sadek. (Haupel Decl., Ex. I 42:13-43:3)

written closing instructions were provided by FFE to Winthrop-NJ. PNC, however, contends that there is no copy of written closing instructions because Winthrop-NJ's files were shredded in 2009 by Boxman, David Sadek's partner and co-owner of Winthrop-NJ. (PNC Facts ¶¶ 89-90) PNC insists, however, that FFE did send written closing instructions to Winthrop-NJ to record the mortgage.[7] PNC cites to a document from FFE to Winthrop-NJ that reads "loan must be recorded in 1st lien position." (Rudnick Decl., Ex. O) That document, however, refers to a borrower named Shmuel Rapoport and a property address of 43 South Plaza Place, Atlantic City, NJ, not the property at issue here. Apparently this was offered as an example of FFE's usual practice. A jury could accept is as representative of a course of dealing in what were, after all, repetitive, cookie-cutter transactions. And there is evidence that FFE routinely enclosed such written instructions to record the mortgage, although it is not clear who bore responsibility for ensuring such written instructions were actually included in the closing document set. (*See* Haupel Decl., Ex. J, 26:20-27:20, Ex. L, 24:15-23, 26:20-28:11)

Of course, a closing will not take place at all without *some* instructions from the lender. And it beggars belief that a lender would not issue the routine instruction that its mortgage lien be recorded. That is the whole point, from the lender's point of view. Even assuming that FFE gave no such instructions, a jury could conclude that this was the result of manipulation by Sadek, in his double role on behalf of the lender and UG's agent, Winthrop. This scenario positively bristles with issues of fact.

As to breach of the Commitment, the Title Insurers emphasize that it was no more than an offer to issue title insurance provided certain conditions were met. Under the Commitment, Title Insurance Defendants "commit[ted] to issue its policy or policies of title insurance...upon payment of the premiums and

---

[7]     PNC's brief is phrased misleadingly: "On October 31, 2005, Winthrop NJ closed the Loan. FFE sent written closing instructions to Winthrop NJ requiring it to record the mortgage in first lien position." (Brf., at 2) Apparently the first sentence is about this transaction; the second is seemingly a description of what usually was done.

charges therefor." (Haupel Decl., Ex. AA) The loan documents (the HUD-1 in particular) represent that the premium was paid. Sadek testifies that it *was* paid, albeit *via* some complicated offsetting arrangement.[8] That may or may not have been true, but it cannot be determined on summary judgment. Sadek was in a position to cause Winthrop, as UG's agent (per his sister, Ms. Greenberg), to represent to outside lenders that the premium was paid. UG's agent put them in a position to believe that the Commitment had ripened or would ripen into an actual policy of title insurance.

A second precondition is that the mortgage and deed be recorded. Schedule B of the Commitment sets forth the requirements, including that a mortgage and deed be recorded. As to that, UG's agent, Winthrop-NJ, could be found responsible for the lapse on this record.

I do not say that PNC must or even will prevail. But here, too, issues of fact bar summary judgment in favor of the Title Insurers.

### D. Negligence

In Count Seven, PNC has alleged a cause of action sounding in negligence. Specifically, PNC maintains that UG is liable for Winthrop-NJ's alleged negligence in failing to record the mortgage and failing to follow written closing instructions.

The relationship between a title company and an insured is "essentially contractual." *Walker Rogge v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 220 (N.J. 1989). This is because the title company does not provide services to the insured; rather, that relationship culminates in the issuance of a title insurance policy and thus, the policy sets the rights and responsibilities of the company and the insured. *See id.* However, a title company may be liable for negligence where "the company engaged in conduct by which it voluntarily

---

[8]     An HUD-1 statement notes $2157 next to the entry for "title insurance" and an invoice from Winthrop-NJ reflects the same amount for title insurance and related fees. (Haupel Decl., Exs. Z, GG) David Sadek testified that monies he owed to Winthrop-NJ would be denoted as "offsets." (*Id.*, Ex. D, 82:6-17) The premium owed, he said, would be listed on the HUD-1 as "paid outside of closing" and would "be a credit against money owed to [Winthrop-NJ] for title insurance." (*Id.* at 82:18-20)

assumed a duty in addition to those obligations created by the policy." *RTC Mortg. Trust 1994 N-1 v. Fidelity Nat'l Title Ins. Co.,* 58 F. Supp. 2d 503, 536 (D.N.J. 1999) (citing *Walker Rogge,* 562 A.2d at 221).

Issues as to UG's assumption of an independent duty *via* the CSL are discussed above.

Other facts suggest that a negligence claim is sustainable on this record. Here, I again interpret the facts, as I must, in the light most favorable to PNC.

Winthrop-NJ seems to have obscured and divided responsibility for settlement of the transaction at every turn. No one, it seems, was clearly responsible for the most important aspects of settlement of this mortgage transaction. Ms. Greenberg sent the closing documents, including the mortgage, to Rachel Sadek, who sent the documents to Winthrop-NJ's Staten Island office. That suggests that Winthrop-NJ would be responsible for settlement, including the recording of the mortgage. Greenberg, at least, seems to have thought so. The Closing Network, however, performed a major part of the settlement, receiving the proceeds and paying off the prior liens. Winthrop-NJ seems to be unable to lay its hands on the relevant records. Neither Ms. Greenberg nor Rachel Sadek could testify that the closing package contained written closing instructions at all, or that such instructions included a direction to record the mortgage. A jury could conclude that the lack of any instruction to record the mortgage would have been a red flag to anyone in this business. Miriam Greenberg and Rachel Sadek, however, seem not to have read the closing instructions, and each said she sent the documents on to someone else, which discharged her responsibility. No one at Winthrop-NJ, it seems, checked. (*See* Haupel Decl., Ex. J, 27:17-20, Ex. L, 24:15-23, 26:20-27:20) And Winthrop-NJ is UG's agent.

Summary judgment is denied as to the negligence claim.

## E. Fraud

In Count Eight, PNC has alleged that the Title Insurers are liable for Winthrop-NJ's alleged fraud in failing to record the mortgage, failing to record a

deed from Etty Sadek to herself and her husband, and in failing to pay UG the premium for title insurance.

To establish common law fraud, a plaintiff must prove: (1) a material misrepresentation of a presently existing or past fact, (2) knowledge or belief by the defendant of its falsity, (3) an intention that the other person rely on that misrepresentation, (4) reasonable reliance thereon by the other person, and (5) resulting damages. *See Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997).

Here, too, there are issues of fact. A jury could conclude that the multiple failures in this transaction were not negligent, but purposeful. The intent, the argument would run, was to enable David Sadek to sell the house out from under whatever entity bought the loan from Sadek's company, FFE. A jury issue is presented as to whether UG's negligent oversight permitted this to occur. Certainly, UG could be found blameworthy for failing to note David Sadek's presence on all sides of the transaction, and the common ownership of entities that should have checked and offset each other.

## F. Bad Faith

Counts Nine and Ten are substantially the same. In those counts, PNC alleges that the Title Insurers acted in bad faith when, without sufficient basis, denied PNC's claim for indemnity under the CSL.

To demonstrate bad faith based on a denial of insurance benefits, "a plaintiff must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." *Pickett v. Lloyd's*, 621 A.2d 445, 453 (N.J. 1993). In other words, bad faith in denial of insurance benefits is shown where there are "no debatable reasons" for the denial. *Id.* at 457. "Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim." *Id.* at 454-54. Where an insured has a reasonable basis on which to deny the

claim, there has been no violation of the implied covenant of good faith and fair dealing, either. *See JPC Merger, Sub, LLC v. Alterra Am. Ins. Co.*, 2015 WL 4773302, at *11 (D.N.J. Aug. 13, 2015); *see generally Wadeer v. New Jersey Mfrs. Ins. Co.*, 110 A.2d 19, 26 (N.J. 2015) (covenant of good faith and fair dealing is implied in every insurance contract in New Jersey).

Whether a bad faith claim can be maintained will depend on many of the issued outlined above. To put it another way, the claim will depend on a jury's decision as to the extent to which the Title Insurers' analysis of the claim should have coincided with that of PNC. Here, too, summary judgment must be denied.

## CONCLUSION

For the foregoing reasons, the Title Insurers' motion for summary judgment as to the claims alleged against them by Plaintiff PNC is DENIED. An appropriate order follows.

**KEVIN MCNULTY, U.S.D.J.**

Date:  March 11, 2016